**Henry LEUTWYLER and Talk to the Hand, Inc., Plaintiffs,**

v.

**OFFICE OF HER MAJESTY QUEEN RANIA AL–ABDULLAH, Rania Atalla, Suhad Fitiany, and Alia A Toukan, Defendants.**

No. 00 Civ. 5485(GEL).

United States District Court, S.D. New York.

Aug. 8, 2001.

Amy J. Benjamin, Darby & Darby PC, (Eric A. Prager and Shernette A.L. Stafford, of counsel), New York City, for Plaintiffs Henry Leutwyler and Talk to the Hand, Inc.

John S. Willems, White & Case LLP (Karen M. Asner and Sali A. Qaragholi, of counsel), New York City, for Office of Her Majesty Queen Rania Al Abdullah, Rania Atalla, Suhad Fitiany and Alia A. Toukan.

*OPINION AND ORDER*

LYNCH, District Judge.

This action for copyright infringement, breach of contract and defamation, among other claims, is brought by Plaintiff Henry Leutwyler, A Swiss national who resides in New York City, and his corporation, Talk To The Hand, Inc. (collectively, "Leutwyler"), against Queen Rania Al–Abdullah of the Hashemite Kingdom of Jordan, the Office of the Her Majesty the Queen of Jordan (the "Office of the Queen") (a Jordanian governmental body) and three officials of the Office of the Queen (the "Individual Defendants") (collectively, "Defendants"). On March 28, 2001, the Government of the United States filed a Suggestion of Immunity, requesting the Court to defer to the Executive Branch's determination that Queen Rania is a head of state who should be immune from suit in courts of the United States. Such an Executive Branch decision is entitled to conclusive deference from the courts. *See, e.g., Lafontant v. Aristide,* 844 F.Supp. 128, 131–32 (E.D.N.Y.1994) Accordingly, by order dated June 13, 2001, the Court dismissed all of the claims asserted against Queen Rania.

The remaining Defendants have moved to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), contending that under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, they are covered by the longstanding presumption that foreign sovereigns and their agents are immune from suit in federal court, and that no exception to the Act covers the claims alleged in this action. They have also moved to dismiss under the doctrines of *forum non conveniens* and comity.

For the reasons that follow, Defendants' motion to dismiss for lack of subject matter jurisdiction is granted in part and denied in part with regard to those claims asserted against the Individual Defendants. All of the claims asserted against the Office of the Queen are dismissed, because that entity does not have a juridical existence. Leave is granted, however, for Leutwyler to file and serve an amended complaint within 30 days that asserts his copyright infringement and/or breach of contract claims against an appropriate Jordanian governmental entity. Additionally, Defendants' *forum non conveniens* and comity motions are denied.

## BACKGROUND

On a motion to dismiss for lack of subject matter jurisdiction, the Court is required to accept the facts of the plaintiff's complaint as true, unless they have been disputed by the defendants through extrinsic evidentiary submissions, which the Court must then consider to resolve the factual dispute. *Filetech S A. v. France Telecom S A,* 157 F.3d 922, 932 (2d Cir. 1998); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027–28 (D.C.Cir.1997) (holding that on a

motion to dismiss based on a sovereign immunity defense, "the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial.") (internal quotations omitted). Unless otherwise noted, the facts pertinent to the Court's consideration of Defendants' jurisdictional motions are not controverted by the parties.

***Leutwyler Photographs the Royal Family***

Henry Leutwyler is a noted New York-based photographer who, among his artistic endeavors, has often been hired as a portraitist by world leaders, entertainers and various other luminaries. (First Am. Compl. ¶¶ 4, 12.) He and his wife, Ruba Abu-Nimah, are co-owners of Talk To The Hand, Inc., a corporation based in New York City, "through which Leutwyler conducts his photography business." (*Id.* ¶ 5; Leutwyler Decl. ¶ 2.). Ms. Abu-Nimah is the daughter of Hasan Abu-Nimah, who formerly served as Jordan's Ambassador to the United Nations. (Defs.' Mem. Supp. at 2.)

In July 1998, a representative of Princess Rania Al Abdullah, the wife of Crown Prince Abdullah bin Al-Hussein, at that time the heir apparent to Jordan's monarchy, contacted Leutwyler to arrange for him to take black-and-white portraits of the princess in Amman, Jordan. (First Am. Compl. ¶ 14 & Ex. A at 1.) Leutwyler sent a "Production Estimate" to Princess Rania, in which he stated that he would retain all copyright and usage rights in the photographs—with the exception of a limited license to Princess Rania for "public relations and press" purposes. (*Id.* ¶ 15 & Ex. A at 1-2.) The parties canceled the photo shoot, however, when King Hussein bin Talal. Princess Rania's father-in-law, was stricken with cancer. (First Am. Compl. ¶ 16 & Atalla Aff Ex A at 43) King Hussein died on February 7, 1999, and Prince Abdullah and his wife became King and Queen of Jordan. (Atalla Aff. Ex. A at 43-44.)

Jordan is a patriarchal monarchy, governed by a king who serves as head of state, chief executive and commander-in-chief. The King exercises his executive authority in part through a governmental body called the Royal Court, which acts as a political and administrative conduit through which the King commands the government and the armed forces.[1] The Royal Court, which might be analogized to a hybrid of the United States' Office of the President and various administrative agencies within the Executive Branch, contains various sub-offices and departments that conduct a variety of executive and administrative functions. (Al Rifa'i Aff. ¶¶ 3, 5-6.) One such department is the Office of the Queen, which assists the Queen with her various public functions.

According to Samir Al Rifa'i, the Secretary General of the Royal Court, the Office of the Queen "is not responsible" for any of Queen Rania's "private or personal functions." (*Id.* ¶ 11.) Indeed, Al Rifa'i avers that two other sub-offices within the Royal Court—His Majesty's Chief Chamberlain and His Majesty's Private Chamberlain—are "responsible for the private affairs of the Royal Family." (*Id.* ¶ 9.) The Office of the Queen has about seventeen staff members, all of whom are employed by the Royal Court. (*Id.* ¶ 13.)

By letter dated August 2, 1999, defendant Suhad Fitiany, Queen Rania's Personal Assistant, informed Leutwyler that the Queen was once again interested in arranging for Leutwyler to travel to Am-

1. The King also carries out his governmental functions through a prime minister, whom he appoints, and the Council of Ministers, a cabinet-like body whose constituent members are also royally appointed. (Al Rifa'i Aff. ¶ 3.)

man—this time, to take photos of the Royal Family at its residence. (First Am. Compl. ¶ 17; Leutwyler Decl. ¶ 5 & Ex. A.) Fitiany is employed by the Royal Court (Al Rifa'i Aff. ¶ 16), and her official responsibilities consist of "a wide variety of matters relating to Her Majesty's public functions, engagements and image," including scheduling "appointments with hair and makeup and other professionals for Her Majesty's public functions, appearances and image" and drafting "correspondence relating to such activities." (Atalla Aff. ¶ 8.)

Leutwyler accepted Queen Rania's offer, and, by letter to Fitiany dated August 2, 1999, agreed to perform his services gratis [2]—with the exception of his travel, lodging, film and developing costs. (First Am. Compl. ¶ 17 & Ex. E; Leutwyler Decl. ¶ 6 & Ex. B.) Later that month, Leutwyler, accompanied by a hair stylist and makeup artist.[3] traveled to Amman, where he took approximately 2,500 photos of the Royal Family, including both formal portraits and casual shots. (First Am. Compl. ¶ 18; Leutwyler Decl. ¶ 10.)

Following the photo shoot, Leutwyler returned to his New York City studio, where he developed temporary "work print[s]" of the various photos taken in Amman. On October 1, 1999, he sent approximately 140 of the prints to defendant Alia Toukan, Queen Rania's Press Secretary (First Am Compl. ¶ 19, Leutwyler Decl. ¶ 12.) Toukan, also an employee of the Royal Court, is responsible as part of her official duties for "overseeing all press-related matters for Her Majesty and the office of Her Majesty" (Al Rifa'i Aff. ¶ 15), including reviewing "newspaper and magazine articles that discuss Her Majesty" to ensure that "Her Majesty is portrayed in a favorable light." (Atalla Aff. ¶ 7.) The prints were marked with the following notices. "Copyright Henry Leutwyler, New York City 1999" and "Work Prints for Review Purposes Only." (First Am. Compl. ¶ 20.) In a letter accompanying the prints, Leutwyler informed Toukan that he would grant the Royal Family a limited license for their "personal use and all press rights for all print media throughout the Middle East." Otherwise, the letter further stated, Leutwyler would retain usage rights. (First Am. Compl. ¶ 19; Leutwyler Decl. ¶ 13 & Ex. C.)

By letter dated November 16, 1999, Leutwyler wrote to Toukan to inquire about King Abdullah and Queen Rania's opinions of the interim photos and whether they were interested in ordering any of the final versions. Neither Toukan nor any other employee of the Royal Court responded to Leutwyler's letter. (First Am. Compl. ¶¶ 21–22; Leutwyler Decl. ¶ 14 & Ex. D.)

***Publication of Photos in the Jordan Diary***

In December 1999, the International Press Office ("IPO") of Jordan, which at that time was a sub-department within the Royal Court (Atalla Aff. ¶ 10), published *The 2000 Jordan Diary* (the *"Jordan Diary,"* a complete copy of which is annexed as Exhibit A to the Atalla Affidavit). The

2. Leutwyler avers that he would ordinarily have charged a client "in excess of $100,000" for comparable services. (Leutwyler Decl. ¶ 6.)

3. There is some dispute as to which person or entity actually paid these individuals' fees. Leutwyler claims that they were compensated out of Queen Rania's personal funds. (Leutwyler Decl. ¶ 15.) However, Rania Atalla, the Chief of Staff for the Office of Her Majesty, avers that the funds were actually derived from "an account set up to pay expenses incurred by Ms. Fitiany in connection with Her Majesty's public functions and appearances." (Atalla Aff. ¶ 4.) Since this factual dispute is not material to Defendants' motions to dismiss, the Court need not resolve it at this time.

*Jordan Diary,* which was marketed and distributed in various countries, including the United States,[4] contains information about, among other things, Jordan's history, political structure and geography. (Atalla Aff. Ex. A. & First Am. Compl. Ex. H.) According to Atalla, the diary serves as "a public relations tool that is typically given away in order to promote a better understanding of Jordan and to encourage tourism" there. (Atalla Aff. ¶ 13)

Two of the photos that Leutwyler took in August 1999 were published in the *Jordan Diary.*[5] The IPO acknowledged Leutwyler's copyright interest in the photos by printing "© Henry Leutwyler" in small type just above the photos' lower-left corners. Leutwyler alleges, however, that the photos, which have been registered with the Library of Congress (Leutwyler Decl. ¶ 18 & Ex. H), were "reproduced, distributed, and publicly displayed" by "Defendants" without his "authorization or prior knowledge." (First Am. Compl. ¶ 39.)

At oral argument on April 6, 2001, counsel for Leutwyler stated that her client is proceeding on the theory that one or more of the Individual Defendants contributorily infringed Leutwyler's copyrights by furnishing the photos to the IPO. (Tr. 25.) However, Leutwyler does not specifically identify in his First Amended Complaint which of the Defendants engaged in such conduct. In her affidavit, Atalla avers that "[n]either The Office [of the Queen] nor any its employees has a role in the publication of *The 2000 Jordan Diary* or any responsibilities with the IPO," (Atalla Aff. ¶ 13), but she does not specifically deny that any of the Individual Defendants provided photos to the IPO.

***Publication of Photos in Harper's Bazaar***

In early December 1999, *Harper's Bazaar* (*"Harper's"*), a well-known fashion magazine, notified Leutwyler that it intended to publish a cover story about Queen Rania, and asked him if he would be willing to furnish some of the August 1999 photos to accompany the article. Leutwyler supplied the magazine with four of the photos, with the proviso that *Harper's* endeavor to obtain the Queen's permission to publish her image. (First Am. Compl. ¶¶ 26–27.)

On March 5, 2000, defendant Rania Atalla, the Chief of Staff of the Office of the Queen and an employee of the Royal Court (Al Rifa'i Aff. ¶ 15), sent an e-mail to Leutwyler, in which she requested that he decline to provide any photos to *Harper's.* (First Am. Compl. ¶ 28; Leutwyler Decl. ¶ 16 & Ex. F.) As Chief of Staff, Ms. Atalla's official responsibilities include "supervision of all aspects of Her Majesty's public functions" (Al Rifa'i Aff. ¶ 14), and ensuring "that Her Majesty's public image is accurately portrayed and, if necessary, protected." (Atalla Aff. ¶ 6.) In the e-mail, Atalla also noted that it was the Royal Court's "understanding ... that the pictures you took of Her Majesty and Her family are personal pictures and are Her property. As such, any decision to use and publish any of them rests with her Majesty." (Leutwyler Decl. Ex. F.) By letter dated March 22, 2000, Atalla notified Leutwyler that the Royal Court would take the position that the Royal Family never entered into any written agreement

4. Throughout 2000, the Royal Court maintained a website (http://*www.kinghussein.gov*) that advertised the sale of the *Jordan Diary* for $37.50 U.S. Purchasers, however, could not place orders directly through the site. (First Am. Compl. ¶ 40 & Ex. H.)

5. One of the photos is a casual shot of King Abdullah II and Queen Rania with their children. (Atalla Aff. Ex. A. at 45.) The other is a more formal portrait of the King. (*Id.* at 54.)

concerning usage rights for the photos, but had an oral understanding with Leutwyler that the photos were taken solely for their personal use. (First Am. Compl. ¶ 29 & Ex. E.)

Leutwyler responded by letter dated March 24, 2000. With regard to Atalla's legal arguments, he stated that "one would assume that you would be aware that copyright and usage rights remain property of the photographer in perpetuity" and that, not having heard from the Royal Court regarding his offer to grant a limited use license, he assumed that the offer was acceptable. He also denied having agreed that the photos were taken solely for the King and Queen's personal use. (Leutwyler Decl. Ex. G at 1–2.) Leutwyler next proceeded to elaborate on his decision to furnish some of the photos to be published in the March 2000 issue of *Harper's:*

> Please know that I have been withholding all these images for months in spite of numerous requests from the press community worldwide. I have refused any request to make any of the pictures available to any one, including Harper's Bazaar during the time when their request for an interview was not approved. *I would like to further assure you that it was never my intention to use Their Majesties pictures for any commercial use or for profit purposes.* It was never my intention and it is not my intention now to give any of these images to anyone without prior approval. I produced these images within the framework of admiration, esteem and devotion for Their Majesties.
>
> I allowed Harper's Bazaar to review the images on condition that I receive a letter from them indicating that no image would be used without your consent ... I was later informed by Harper's Bazaar that, indeed, there was an agreement and that you were cooperating with a feature article. All my actions were done in good faith and I thought I was doing not only the right thing but the desirable as well.

(Leutwyler Decl. Ex. F at 2) (emphasis added.)

Leutwyler further informed Atalla that the magazine was unable to pull the photographs of Queen Rania, because it learned of the Queen's (and Leutwyler's) wishes after the issue had gone to press. (*Id.*) That same day, Atalla sent an e-mail message to Leutwyler in which she stated, among other things, that even if Leutwyler had a copyright interest in the photos, the King and Queen retained a veto over whether such "personal" photos could be published.[6] However, perhaps unbeknownst to Leutwyler at the time he drafted the March 24, 2000, letter, the magazine ultimately decided to publish only one of his photographs—a print that Queen Rania had apparently approved for publication. (First Am. Compl. ¶ 35.)

Subsequently, Leutwyler claims, he learned that Toukan (and perhaps the other Individual Defendants as well) had informed representatives of *Harper's* that Leutwyler "stole" the usage rights to the August 1999 photographs by furnishing some of them to the magazine. Leutwyler also contends that the Individual Defendants repeated this allegation to third parties, which he claims has damaged his professional reputation and "the market for his photographs." (*Id.* ¶¶ 32–37)

6. In pertinent part, the email reads as follows:

> ... [T]he photos you were com[m]issioned to do are personal and for Their Majesties use. (That is the reason the arrangements for your goodself to travel to Amman for the photo shoot was done through her Majesty's Personal Assistant in the first place.)

(First Am. Compl. Ex. G.)

### *Publication of Photos in Newsweek*

In late May 2000, *Newsweek* magazine notified Leutwyler that it would soon be publishing a lengthy article about Queen Rania. To accompany the article, *Newsweek* requested that Leutwyler provide one of the August 1999 photos of the Queen. (First Am. Compl. ¶ 43.) Leutwyler contends that Toukan (and perhaps the other Individual Defendants as well) learned about *Newsweek's* offer and informed the magazine that Leutwyler "improperly provided his photographs." (*Id.* ¶ 50.) Although *Newsweek* ultimately decided to publish the photographs in its United States and Arabic editions and on its website (*Id.* ¶¶ 47–49), Leutwyler contends that the magazine later removed the pictures from its website in response to the Individual Defendants' comments. (*Id.* ¶ 53.)

### *The Jordanian Action*

On July 6, 2000, the Keeper of the Privy Purse ("Keeper"), who is vested, under Jordanian law, with authority to sue on behalf of the King (Haddad Aff. ¶ 17), commenced an action against Leutwyler in the Amman Court of First Instance. (First Am. Compl. ¶ 56 & Ex K.) The Statement of Claim alleged, among other things, that Leutwyler violated both Article 25 of Jordan's copyright law [7] and certain provisions of its contract law by publishing personal photos of the Royal Family without their consent. (*See* First Am. Compl. Ex. K.) The Keeper sought disgorgement of all revenue that Leutwyler derived from the photos, and injunctive relief to preclude Leutwyler from committing further violations. (*Id.* at 11.) Leutwyler did not answer the Statement of Claim or otherwise appear in the action.[8] (First Am. Compl. ¶ 56.) In an *ex parte* order entered on July 9, 2000, the Amman Court preliminarily enjoined Leutwyler "from selling, distributing or publishing whatever photographs he took of His Majesty King Abdullah II and Her Majesty Queen Rania Al Abdullah and the members of their family, except with their consent and approval. . . ." (Obeidat Aff. Ex. 3.)

### *The Instant Action*

On July 25, 2000, Leutwyler commenced an action in this Court against Queen Rania, the Office of the Queen, Atalla, Fitiany and Toukan. In his First Amended Complaint, which was filed on October 31, 2001, Leutwyler asserted the following claims: (1) Defendants violated federal and international copyright laws by publishing Leutwyler's photos in the *Jordan Diary* (Counts I and VII) (First Am. Compl. ¶¶ 71–75, 111–115); (2) Defendants defamed Leutwyler by falsely informing

7. Article 25 reads as follows:

> A person who takes a photograph shall not be entitled to display, publish or distribute the original, or copies thereof, without the authorization of the person represented therein. The foregoing shall not apply if the publication of the photograph occurred as part of the coverage of a public event, if the photograph was of government officials or of persons enjoying public notoriety, or if the authorities authorized its publication for the public interest. In no event, however, shall the photograph be displayed, published, distributed or circulated where that would be prejudicial to the honor, reputation, dignity or social standing of the person represented therein. The person represented in the photograph may, however, authorize the publication thereof in newspapers, magazines and other information media, even without the consent of the person that has taken the photograph unless otherwise agreed. The foregoing shall apply to photographs taken in any manner whatsoever, whether this was by drawing, engraving, sculpture or any other means.

(Haddad Aff. Ex. 3 at 14–15.)

8. Indeed, Leutwyler contends that he was never served with the Keeper's papers. (First Am. Compl. ¶ 56.)

*Harper's* and *Newsweek* that he had improperly decided to publish photos from the August 1999 shoot (Count II) (First Am. Compl. ¶¶ 76–86); (3) Defendants breached a contract entered into with Leutwyler by publishing photos in the *Jordan Diary,* in violation of the terms of the limited license set forth in Leutwyler's October 1, 1999, letter to Toukan (Count III) (First Am. Compl. ¶¶ 87–90); (4) Defendants tortiously interfered with Leutwyler's business relations and prospective business advantage by dissuading various publications from contracting with him to furnish copies of prints from the August 1999 photo shoot (Count IV) (First Am. Compl. ¶¶ 91–97); and (5) Defendants intentionally inflicted emotional distress on Leutwyler by publishing false statements about him and commencing the Jordanian Action (Count V) (First Am. Compl. ¶¶ 98–103).[9]

On November 22, 2000, Defendants moved to dismiss Leutwyler's complaint in its entirety. In their motion papers, they contend that the Court lacks subject matter jurisdiction over all of the claims asserted in this action, because Defendants' putative conduct does not fall within the enumerated exceptions to sovereign immunity set forth in the FSIA, and alternatively, that the action should be dismissed pursuant to the doctrines of *forum non conveniens* and comity. Following limited jurisdictional discovery, Leutwyler filed opposition papers, and the Court heard oral argument on the motions on April 6, 2001.

DISCUSSION

### I. *Dismissal of the Queen and the Office of the Queen*

As already noted, the Court dismissed the action as to Queen Rania at the instance of the Executive Branch. At oral argument, counsel for Leutwyler conceded that the Office of the Queen is not a juridical entity capable of being sued in its own name. (Tr. 4–5.) Accordingly, all claims asserted against that defendant in the First Amended Complaint are subject to dismissal on that ground alone.

### II. *Subject Matter Jurisdiction Under the Foreign Sovereign Immunities Act*

In their motion to dismiss, Defendants first contend that the Court lacks subject matter jurisdiction over this action, because none of them is amenable to suit under the FSIA, which is the "sole basis" for exercising subject matter jurisdiction over an action involving such a defendant. *See, e.g., Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); 28 U.S.C. § 1330

#### A. *The FSIA Standard*

Under the FSIA, a "foreign state" is presumptively immune from being sued in federal court 28 U S.C. § 1604 In pertinent part, the term "foreign state" is defined as follows:

> (a) A 'foreign state' includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
>
> (b) An 'agency or instrumentality of a foreign state' means any entity -
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof

28 U S C. §§ 1603(a) & (b) Although § 1605(b) does not specifically refer to nat-

9. Leutwyler also seeks a declaratory judgment "that the ex parte order issued by the Amman Court of First Instance on July 9, 2000 is of no force or effect in the United States." (Count VI) (First Am. Compl. ¶¶ 104–110.)

ural persons, it has been generally recognized that individuals employed by a foreign state's agencies or instrumentalities are deemed "foreign states" when they are sued for actions undertaken within the scope of their official capacities. *See, e.g., Bryks v. Canadian Broadcasting Corp.,* 906 F.Supp. 204, 210 (S.D.N.Y.1995).

When a defendant moves to dismiss pursuant to the FSIA, it has the initial burden of making a *prima facie* showing that it falls within the scope of § 1604. *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for A.W. Galadari,* 12 F.3d 317, 325 (2d Cir.1993). That does not end the jurisdictional inquiry, however. The plaintiff can then rebut the presumption of immunity for the foreign defendant by proffering evidence of record that the defendant undertook certain activities that fall within the scope of several specifically enumerated exceptions to FSIA immunity. *Id.;* 28 U.S.C. § 1605. At that point, the burden once again shifts to the foreign defendant, which must prove by a preponderance of evidence that the putative exceptions are inapplicable. *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.,* 923 F.2d 380, 390 n. 14 (5th Cir.1991).

### B. *Were the Individual Defendants Acting in Their Official Capacities?*

Leutwyler does not dispute that Defendants—a department within the Royal Court and three of its employees—can be considered "foreign states" for the purpose of 28 U.S.C. § 1604. Nevertheless, he seeks to defeat the Individual Defendants on the first prong of the FSIA inquiry, arguing that none of them ever acted within her official capacities during the events that gave rise to this action. Accordingly, he contends that they cannot cloak themselves with the blanket of immunity that the FSIA accords to "foreign states" or their constituent agencies or instrumentalities. (Pls.' Mem. Opp. at 6–11.)

An individual employed by a foreign state enjoys no FSIA immunity for acts that are "beyond the scope" of her official responsibilities. *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1197 (S.D.N.Y. 1996). Acts that are of a "personal and private" nature are not undertaken within an employee's official capacity for FSIA purposes. *Jungquist,* 115 F.3d at 1028. In determining whether acts are official or personal, the Court must be mindful of "the nature of the individual's alleged actions, rather than the alleged motives underlying them," *id.,* and is required to give "great weight" to any extrinsic submissions made by the foreign defendants regarding the scope of their official responsibilities. *Kline v. Kaneko,* 685 F.Supp. 386, 390 (S.D.N.Y.1988).

Leutwyler advances two closely-related contentions in an effort to demonstrate that Atalla, Fitiany and Toukan were acting in their individual capacities throughout the events in question. First, noting that the Keeper of the Privy Purse contended in the Jordanian Action that the photos were personal in nature.[10] Leutwyler argues that subsequent conduct

10. For example, Leutwyler excerpts the following assertion from the Statement of Claim:

> [Because] the pictures ... represent family pictures taken on the basis of a special agreement with [Leutwyler], in a private place, which is the home of Their Majesties, it ensues that such pictures are considered inherent to the person because they represent his appearance and features. They also fall under the definition of the private life of persons, which includes personal and family life that constitutions and laws ... protect from undesired exposure or intrusion by others.

(Obeidat Aff. Ex. 1 at 6.)

related to the photos was perforce outside the employees' official responsibilities. (Pls.' Mem. Opp. at 8–10.) Second, Leutwyler argues that the Individual Defendants were acting outside of the scope of their authority because the Office of the Queen, for which they worked, is not authorized to assist Queen Rania with any of her personal or private matters. (Pls.' Mem. Opp. at 10–11.) However, even if the events relating to the actual photography of the Royal Family were private acts (and if the Individual Defendants are bound by putative admissions made by other officials in the foreign pleading), the admissions are entirely immaterial to the question of whether the Individual Defendants' *subsequent* conduct—the conduct that gives rise to the gravamen of Leutwyler's complaint—was undertaken in their official capacities. A careful analysis of what the Defendants are alleged to have done to render them liable in damages reveals that their acts were indeed undertaken in furtherance of their official responsibilities.

Leutwyler's claims derive entirely from events that occurred well after the August 1999 photo shoot: (1) the IPO's publication of two of Leutwyler's photos in the *Jordan Diary* in December 1999, supposedly facilitated by certain of the Individual Defendants; (2) Toukan and the other Individual Defendants' alleged defamatory statements to *Harper's* about Leutwyler in early 2000; (3) certain of the Individual Defendants' alleged defamatory statements to *Newsweek* in May 2000 to spur the magazine to remove some of Leutwyler's photos of Queen Rania from its website, and (4) the institution of the Jordanian Action against Leutwyler in July 2000, which, he appears to allege, was an abuse of process by the Office of the Queen. However, to the extent that Leutwyler alleges with any degree of particularity that the Individual Defendants were involved in the above-listed incidents at all, the Individual Defendants have demonstrated, by affidavits regarding the scope of their official responsibilities (none of which are controverted by Leutwyler), that their actions were well within their official capacities.

To begin with, in neither the First Amended Complaint nor his supplemental allegation does Leutwyler allege any specific conduct by either Atalla or Fitiany that implicates them in the publication of the *Jordan Diary*, the conversations with *Harper's* or *Newsweek*, or the filing of the Jordanian action. He does allege that Toukan made defamatory statements about him to *Harper's* in an effort to persuade the magazine to pull photos from the August 1999 shoot that Leutwyler had furnished. (First Am. Compl. ¶ 33.) He does not specifically allege, however, that she was involved in any of the other events that gave rise to his instant claims. Leutwyler's claim that the Individual Defendants acted in their private capacities is thus considerably hampered by the fact that, except for the single allegation regarding Toukan, his complaint does not specify what it is they are supposed to have done.

To the extent that Leutwyler can be taken as alleging that the Individual Defendants did play some role in the actions he complains of, however, it is clear that any such actions were taken in furtherance of their official duties. Atalla, the Chief of Staff of the Office of the Queen, is responsible for various duties, such as ensuring "that Her Majesty's public image is accurately portrayed, and, if necessary, protected." (Atalla Aff. ¶ 6.) Fitiany, Queen Rania's Personal Assistant, is responsible for "a wide variety of matters relating to Her Majesty's public functions, engagement and image," including scheduling "appointments with hair and makeup and other professionals for Her Majesty's public functions, appearances and image." (Atalla Aff. ¶ 8.) Toukan, Queen Rania's

Press Secretary, is responsible for overseeing "all press-related matters" for Queen Rania and the office of Her Majesty, including reviewing "newspaper and magazine articles that discuss Her Majesty" to ensure that "Her Majesty is portrayed in a favorable light." (Atalla Aff. ¶ 7) Accordingly, to the extent that these Defendants were involved with activities such as distributing selected photos to the IPO for publication, or attempting to dissuade magazines from publishing photos that the Queen for whatever reason though would not further her image, they were plainly attempting to control the manner in which the Queen's image was projected in international media circles, a quintessential responsibility of the legions of media consultants who are in the employ of world leaders.[11] Whether or not the photographing of the Royal Family by Leutwyler was arranged in the Royal Family's capacity as private citizens (assuming that the Royal Family of Jordan can be said to have such a capacity), once the photos were sought to be injected into the international media (whether by Leutwyler or by the Queen), they became a matter of public, and therefore official, import. Any conduct of Atalla, Fitiany and Toukan, on behalf of the Queen, to control when, where and how her image was disseminated fell directly within the scope of their employment responsibilities.[12]

Accordingly, because the acts undertaken by the Individual Defendants—and, by imputation, the Office of the Queen—that gave rise to Leutwyler's claims were undertaken in their official capacities, the Individual Defendants are "foreign states" for the purpose of 28 U.S.C. § 1604, and are therefore entitled to a presumption of immunity from suit in federal court.

### C. *FSIA Exceptions Proffered by Leutwyler*

Even parties that qualify as "foreign states" may nonetheless be subject to suit if their actions fall within one of the various exceptions to the FSIA that operate to abrogate a foreign party's presumptive sovereign immunity. Leutwyler argues that the Individual Defendants' conduct fell within two separate exceptions, relating to "commercial activity" and "non-commerical torts." [13] The Court will consider them in turn.

**11.** Leutwyler has made vague allegations that the Individual Defendants intentionally inflicted emotional distress on him by commencing and prosecuting the Jordanian Action. (First Am. Compl. ¶¶ 98–103.) However, although the individuals are listed as potential witnesses in that action (Obeidat Aff. Ex. 1), there is no evidence whatsoever suggesting that they played any role in the Keeper's decision to bring suit in Amman.

**12.** Moreover, Leutwyler fails to allege, and there is no reason to believe, that any of the Individual Defendants had any personal or unofficial motive for any of these acts. Their only conceivable reason for getting involved with Leutwyler's photographs was because they were asked to undertake such actions as officials of the Office of the Queen. Assuming that some directives of the Queen could be so clearly divorced from any possible public concern that an employee of her Office who carried them out would be on notice that executing them went beyond the scope of her official duties, the actions here are nowhere near that line. Given the broad duties of the Individual Defendants with respect to the Queen's public image, and the manifest governmental interest in protecting that image, it cannot be contended that their acts were anything other than official.

**13.** Leutwyler also asserts in passing that the "international takings" exception of 28 U.S.C. § 1605(a)(3) applies to Defendants' putative copyright infringement—which, he argues, was the taking of his usage rights to intellectual property; however, he has declined "in the interest of economy" to brief the issue. (Pls.' Mem. Opp. at 12 n. 13; *see also* Amended Complaint ¶¶ 68, 113.) Section 1605(a)(3) only applies to the takings of tangible forms of property, *see, e.g., Zappia Middle East Constr. Co., Ltd. v. Emirate of Abu Dhabi,* No. 94

**1. *The Commerical Activity Exception***

In enacting the FSIA in 1976, Congress sought to codify State Department policies that adopted the "restrictive" theory of sovereign immunity and provided that foreign sovereigns should not be immune from federal lawsuits if the causes of action asserted against them arose from their participating in the types of business activities in which private entities and individuals customarily engage. *Weltover,* 504 U.S. at 612–13, 112 S.Ct. 2160. Accordingly, under 28 U.S.C. § 1605(a)(2), a foreign agency or instrumentality loses its presumption of sovereign immunity

> [when] the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The term "commercial activity" is defined in § 1603(d) to include either "a regular course of commercial conduct or a particular commercial transaction or act," and the court must determine "the commercial character of an activity ... by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

**a. *Did the Individual Defendants engage in "commercial" acts?***

The Individual Defendants contend that none of the activities they are accused of engaging in were intrinsically commercial, and, therefore, this exception does not operate to abrogate their presumptive immunity. (Defs.' Mem. Supp. at 18–19.) This argument is unavailing.

■ In *Weltover,* the Supreme Court ruled that in determining whether an alleged act of a foreign sovereign is commercial in nature, a court must decide whether "the particular actions that the foreign [entity] perform[ed] (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." 504 U.S. at 614, 112 S.Ct. 2160 (original emphasis) (internal quotations omitted). A plaintiff need not prove that he received "fair value" or consideration in any form for the act to be rendered commercial for FSIA purposes. *Id.* at 616, 112 S.Ct. 2160. Moreover, the parties' subjective motivations for entering into the transaction are immaterial for the purpose of ascertaining whether it falls within the commercial activity exception. *Id.* at 614, 112 S.Ct. 2160 ("the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose' ").

Applying these principles to the instant action, it is clear that Leutwyler has alleged that the Defendants engaged in at least two series of acts that were unmistakably commercial in nature. First, he argues that the Defendants entered into a contract for him to travel to Jordan to photograph the Royal Family and to grant Queen Rania a limited license to use the pictures for personal use and distribution to Middle Eastern print media. (Pls.' Mem. Opp. at 14–15.) The Individual Defendants contend that those purported acts were not commercial, because Leutwyler waived his customary fee and expressly disclaimed in correspondence with Atalla that he had any interest in profiting from

Civ.1942(KMW), 1996 WL 413680, at *8 (S.D.N.Y. July 24, 1996), and the exception therefore is inapplicable to the instant action.

sales of the photos. (Defs.' Mem. Supp. at 18–19.)[14]

This argument necessarily fails, however, because it addresses Leutwyler's *purpose* in entering into the transaction with the Royal Family rather than the *nature* of the transaction—precisely the opposite of what § 1603(d) and *Weltover* make the focus of the inquiry. If representatives of the Royal Family arranged for Leutwyler to photograph them, develop the prints, and assign to them rights over the resulting photos, that activity is indistinguishable from the garden-variety commercial transactions that families or business entities throughout the world enter into with photographers to obtain portraits for home or office display. *See, e.g., Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations,* 111 F.Supp.2d 457, 462 (S.D.N.Y.2000) (noting that "an important inquiry [under the commercial activity exception] is whether the specific act under consideration is one in which private parties normally engage."). Moreover, although Leutwyler waived his customary fees for the photo shoot, he clearly received consideration for his services, including reimbursement for various costs, such as his expenses for travel, film, developing, hairdresser and makeup artist. (First Am. Compl. ¶ 17 & Ex. E; Leutwyler Decl. ¶ 6 & Ex. B.)[15] Thus, although the *Weltover* Court emphasized that an FSIA plaintiff need not demonstrate that he received value or consideration for a transaction, the fact that Leutwyler did receive consideration for his services to the Royal Family lends further commercial resonance to the parties' various bilateral transactions.

Second, Leutwyler argues that by allegedly furnishing photos taken by Leutwyler for use in the *Jordan Diary,* a publication that has been sold in the United States, the Individual Defendants facilitated a venture that was unmistakably commercial in nature. (Pls.' Mem. Opp. at 15.) Once again, while the *purpose* of publishing the diary may have been governmental (disseminating information about Jordan and encouraging tourism), the *nature* of the activity (publishing and selling books) is clearly commercial. Indeed, the Defendants do not contest that the sale of the books was a commercial act. Rather, they contend that there is no evidence in the record that suggests, even for the limited purpose of establishing subject matter jurisdiction, that they actually provided the photographs to the IPO to be used in the *Jordan Diary.* (Defs.' Mem. Supp. at 19.) The Court will address this argument below; for present purposes, it is sufficient that Defendants concede that the sale of the *Jordan Diary* does in fact constitute commercial activity.

Leutwyler has therefore sustained his burden of demonstrating that the Individual Defendants engaged in certain "commercial activity," as that term is defined in § 1603(e), that could give rise to subject matter jurisdiction under the FSIA.

**b. *Are Leutwyler's causes of action "based upon" or "in connection with" the commercial acts?***

■ To abrogate the Individual Defendants' presumptive sovereign immunity,

14. Defendants cite the following excerpt from Leutwyler's March 24, 2000, letter to Atalla:

> I would like to further assure you that it was never my intention to use Their Majesties pictures for any commercial use or for profit purposes ... I produced these images within the framework of admiration, esteem and devotion for Their Majesties.

(Leutwyler Decl. Ex. G at 2.)

15. Additionally, Leutwyler alleges that he granted a limited license to the Royal Family to use the photos for personal and Middle Eastern press purposes (First Am. Compl. ¶ 19; Leutwyler Decl. ¶ 13 & Ex. C), in exchange for retaining his copyright and other usage rights.

however, more is required. To come within § 1605(a)(2), Leutwyler must also demonstrate that his causes of action claims are "based upon" the commercial activity in the United States, or upon an act in or affecting the United States "in connection with" commercial activity elsewhere. Consequently, the Court must consider whether Leutwyler's claims have a sufficient nexus to the Defendants' commercial activity to meet that standard.

The touchstone for determining whether claims are "based upon" commercial acts is the Supreme Court's decision in *Saudi Arabia v. Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). In *Nelson,* the plaintiff was a United States citizen who journeyed to Saudi Arabia to work in a state-owned hospital. Nelson claimed that Saudi agents imprisoned and tortured him in retaliation for his reporting safety problems he discovered to hospital and governmental officials. *Id.* at 351–53, 113 S.Ct. 1471. Following his release, Nelson sued Saudi Arabia, the hospital and others, asserting a variety of common law tort theories. The defendants moved to dismiss for lack of subject matter jurisdiction under the FSIA, arguing that Nelson could not demonstrate that his claims were "based upon" commercial activity within the meaning of § 1605(a)(2). *Id.* at 353–55, 113 S.Ct. 1471.

The Supreme Court agreed that jurisdiction was lacking, holding that whether a cause of action is "based upon" commercial activity should be determined with reference to "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357, 113 S.Ct. 1471. In other words, the *Nelson* Court ruled, it would not be sufficient for the plaintiff to demonstrate merely that the defendants undertook their objectionable conduct in furtherance of the commercial activity, or that the conduct was somehow incidental to a commercial transaction. Rather, for jurisdictional purposes, he would have to prove that the commercial activity itself gave rise to the particular cause of action. The focus should be on "the gravamen of the complaint." *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109 (5th Cir.1985) (cited with approval in *Nelson,* 507 U.S. at 357, 113 S.Ct. 1471). Applying that holding to the allegations set forth in Nelson's complaint, the Court concluded that the defendants' allegedly tortious acts did not arise directly out of the commercial activity committed in the United States (Nelson's recruitment for employment by the state-owned hospital), and therefore did not constitute a basis for subject matter jurisdiction under 28 U.S.C. § 1605(a)(2). *Id.* at 358–62, 113 S.Ct. 1471.

The statute arguably sets a slightly different standard, however, for causes of action related to commercial activity not performed in the United States. In such cases, sovereign immunity does not apply to causes of action "based ... upon an act performed in the United States [or performed outside the United States if it causes a direct effect in the United States] *in connection with* a commercial activity of the foreign state elsewhere [than in the United States]." 28 U.S.C. § 1605(a)(2) (emphasis added). The Supreme Court in *Nelson* appeared to attach some significance to the distinction, pointing out that

> Congress manifestly understood there to be a difference between a suit "based upon" commercial activity and one "based upon" acts performed "in connection with" such activity. The only reasonable reading of the former term calls for something more than a mere connection with, or relation to, commercial activity.

507 U.S. at 358, 113 S.Ct. 1471.

While it seems to follow from the Court's logic that a cause of action "based upon" an extraterritorial act need be less

closely connected to commercial activity (because it need only be performed "in connection with" such activity) than a cause of action predicated on a commercial act in the United States (which, *Nelson* holds, must be directly "based upon" commercial activity), it is not obvious why Congress would make such a distinction. Why, after all, would Congress want to be more liberal in allowing actions against foreign sovereigns when the act giving rise to the cause of action and the commercial activity providing jurisdiction were committed abroad than when the cause of action arises from commercial activity here in the United States? Moreover, "commercial activity carried on in the United States" is defined extremely broadly under the FSIA, as including any commercial activity "having substantial contact with the United States." 28 U.S.C. § 1603(e). This case is not unusual insofar as both the actions on which the plaintiff bases his suit and the commercial activities alleged could be seen as taking place either here or abroad. Requiring different degrees of connection between the cause of action and the commercial activity depending on the *characterization* of either as domestic or foreign would make little sense.

Even if there is some theoretical difference between the standards provided in the different clauses of § 1605(a)(2), however, there is little doubt that, at a minimum, there must be a "significant nexus" between the commercial activity at issue and the causes of action. *See, e.g., NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir.1993). The Second Circuit, moreover, has applied that test, even in cases involving acts outside the United States, in a manner functionally indistinguishable from the test set forth in *Nelson,* asking whether the "gravamen" of the claims involves the commercial activity, and rejecting arguments based on the different wording of the clauses of § 1605(a)(2). *Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for Galadari (A.W.),* 12 F.3d 317, 329–30 (2d Cir.1993). Therefore, this Court will apply that standard to the causes of action alleged by plaintiff.

**i. The tort claims**

Leutwyler's claims (1) that the Defendants defamed Leutwyler by falsely informing *Harper's* and *Newsweek* that he had improperly decided to publish photos from the August 1999 shoot (Count II) and (2) that they tortiously interfered with Leutwyler's business relations and prospective business advantage by persuading certain publications not to seek to obtain copies of prints from the shoot (Count IV) cannot be maintained under the "commercial activity" exception to the FSIA, because they do not have the requisite nexus to commercial activity.

At the outset, it must be noted that the effort to bring these causes of action under this heading is at best an end-run around a more straightforward analysis of these claims. The FSIA provides an separate exception, the so-called "non-commercial tort" exception, for claims based on "the tortious act or omission" or the foreign state or its officials. 28 U.S.C. § 1605(a)(5).[16] That exception, however,

16. In pertinent part, the non-commercial tort exception reads as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (5) in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to ...
>
> > (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contractual rights.

specifically "shall *not* apply to ... any claim arising out of ... libel, slander or interference with contract rights." 28 U.S.C. § 1605(a)(5)(B) (emphasis added). Thus, the tort claims advanced by Leutwyler in Counts II and IV are of a sort that Congress deliberately excepted from jurisdiction when it specifically addressed the question of waiver of sovereign immunity for torts.

Leutwyler does not contest that subject matter jurisdiction over this claim cannot be based on the non-commercial tort exception. He argues, however, that the exclusion of certain torts in § 1605(a)(5)(B) does not bar jurisdiction over all defamation or interference with contract claims; it merely precludes basing jurisdiction on the "non-commercial tort" exception of § 1605(a)(5). The latter exception including the "exception to the exception" for defamation and interference with contract rights, explicitly states that it applies only to cases "not otherwise encompassed in [§ 1605(a)(2) ]," the commercial activity exception, and the "exception to the exception" itself specifies only that "this paragraph"—that is, § 1605(a)(5) itself—shall not apply to the specified torts, leaving the way open for jurisdiction over actions for those torts if jurisdiction can be obtained under § 1605(a)(2).

Chief Judge Mukasey has written an extremely thoughtful and persuasive opinion arguing that despite these linguistic arguments, the exceptions to the tort exception in § 1605(a)(5) should indeed be read to prohibit actions for the listed torts even when brought under the "commercial activity" exception of § 1605(a)(2). *Bryks v. Canadian Broadcasting Corp.*, 906 F.Supp. 204 (S.D.N.Y.1995). Judge Mukasey wrote:

> I find it anomalous to read the FSIA to permit defamation claims under the commercial activity exception. First, it seems odd that Congress would go to the trouble of specifically excluding defamation claims from the FSIA's abrogation of immunity in one part of the statute, yet would implicitly permit such claims elsewhere in the statute.... Second, the nature of the torts listed in the "exception to the exception" makes it hard to infer that Congress intended that provision to apply only to noncommercial activity, as it would if plaintiff's reading of the statute were correct. [For example,] [i]t is difficult to conceive of a claim for "interference with contract rights" that does not involve commercial activity.... Third, to allow the assertion of defamation claims under Section 1605(a)(2) would create an incongruity between foreign sovereign immunity and the sovereign immunity of the United States.... It seems "unlikely that Congress wished to create a double standard under which foreign sovereigns could be sued in United States courts on tort claims, such as libel, for which the United States Government itself is immune."

*Id.* at 209 (quoting *Gregorian v. Izvestia,* 658 F.Supp. 1224, 1233–34 (C.D.Cal.1987), *aff'd,* 871 F.2d 1515, 1522 n. 4 (9th Cir. 1989)).

As powerful as this reasoning is, it is difficult to square with the literal language of the FSIA Presumably for this reason, it represents a minority view among courts that have considered the issue. The only appellate courts to have squarely addressed the issue have ruled that the "exception to the exception" in § 1605(a)(5) does not affect § 1605(a)(2). *El–Hadad v. United Arab Emirates,* 216 F.3d 29, 35 (D.C.Cir.2000); *Southway v. Central Bank of Nigeria,* 198 F.3d 1210, 1219 (10th Cir. 1999); *The Export Group v. Reef Indus., Inc.,* 54 F.3d 1466, 1473–77 (9th Cir. 1995) [17] *See also WMW Machinery, Inc. v.*

28 U.S.C. § 1605(a)(5)(B)

17. Noting an apparent conflict with *Gregorian,* the *Export Group* panel concluded that the

*Werkzeugmaschinenhandel GmbH IM Aufbau,* 960 F.Supp. 734, 742 (S.D.N.Y. 1997) (Parker, J.), and the district court authority collected in *Bryks,* 906 F.Supp. at 208, and *WMW Machinery,* 960 F.Supp. at 742.

In the absence of controlling authority in this Circuit, this Court is free to decide which view of the issue is more persuasive. Fortunately, in light of the disposition reached below, it is not necessary to reach such a decision in this case. But the divided judgment among respected courts persuades the Court that, if jurisdiction over tort claims for defamation and interference with contractual rights is to be maintained under the "commercial activity" exception, it should at least be very clear that such claims do in fact have the required "significant nexus" with commercial activity. To allow tort claims that would not be allowed under the tort exception to sneak into federal court under the "commercial activity" exception without a clear and strong connection to commercial activity would doubly frustrate the intent of Congress.

Leutwyler does not contend that the Individual Defendants' alleged defamatory statements to the magazines, nor the related statements by which he alleges that they tortiously interfered with his business relations and prospective business advantage, were in themselves "commercial activity" within the meaning of § 1603(a)(2).[18] Rather, he argues that the statements were sufficiently related to the commercial activity at issue—the formation of a contract to photograph the Royal Family and the subsequent publication of the *Jordan Diary*—that Counts II and IV are "based upon" those transactions, or upon an act "in connection with" them, because the statements concerned the photos taken during the August 1999 shoot. (Pls.' Mem. Opp. at 14 n. 19.)

The Court disagrees. The *Nelson* Court stated with unmistakable clarity that even acts undertaken in an effort to facilitate commercial activity in the United States could not constitute a basis for subject matter jurisdiction under § 1605(a)(2). *Nelson,* 507 U.S. at 358, 113 S.Ct. 1471. Here, the relation to commercial activity is considerably more remote. The fact that the allegedly defamatory statements referred to photographs that had been the subject of a commercial contract does not give the defamation a "commercial" character. Leutwyler does not attempt to argue that the commercial success of the *Jordan Diary* was in any way enhanced by the suppression of the photos, and even if he did, *Nelson* holds that that would not be enough.

Consequently, the tort claims fail to satisfy *Nelson*'s exacting requirement that the cause of action directly arise out of a defendant's commercial involvements. Assuming *arguendo* that the Individual Defendants' acts could be characterized as acts "outside the territory of the United States ... [that caused] a direct effect in the United States," which need only be undertaken "in connection with" commercial activity, and that that standard is to some slight degree lesser than the *Nelson* standard, the Court finds that they still do not have a sufficiently "significant nexus" to commercial activity to justify jurisdic-

earlier holding in holding was dicta and therefore non-binding. *The Export Group,* 54 F.3d at 1471 & n. 4.

18. Nor could he easily do so. There is nothing intrinsically commercial about defaming someone or attempting to harm him in retaliation for a perceived breach of decorum against a head of state. Whether or not such acts are properly seen as "sovereign" or "governmental," or simply as furthering the private interests of the Queen as an individual, it would be difficult to understand those acts as "commercial" in any normal sense of the word.

tion under § 1605(a)(2). Accordingly, Counts II and IV are dismissed for lack of subject matter jurisdiction.

**ii. *The publication claims***

Leutwyler also claims that the Individual Defendants violated federal and international copyright laws, and also breached the terms of the limited usage license granted by Leutwyler, by publishing two photos from the August 1999 shoot in the *Jordan Diary* and selling the publication in, among other places, the United States (Counts I, III and VII). As stated above, the Defendants do not contest that the alleged sale of the *Jordan Diary* in the United States, containing two of Leutwyler's copyrighted photos, constituted a "commercial activity" as that term is defined in the FSIA. Nor do they argue that Leutwyler's copyright infringement and breach of contract claims are not "based upon" that commercial activity; moreover, any such argument would fail, because the sale of the publication does indeed directly give rise to those claims.

The Individual Defendants contend, however, that jurisdiction is nevertheless lacking because there is no evidence of record suggesting that *they* personally participated in the commercial activity in question, by participating in the IPO's decision to publish Leutwyler's photos in the *Jordan Diary* or even by furnishing the photos to the IPO. Consequently, they maintain that the Court lacks FSIA subject matter jurisdiction over them with respect to these claims. (Defs.' Mem. Supp. at 19; Defs.' Reply Mem. at 5, 7–8.)

This argument appears to go to the merits of Leutwyler's case rather than to the jurisdictional question of immunity. Admittedly, in the context of sovereign immunity there may be some overlap between jurisdictional questions and the merits of allegations. *Cf. Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics,* 665 F.Supp. 323, 333 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 26 (2d Cir.1988). Because sovereign immunity is immunity from *suit* and its attendant burdens, and not merely from *liability,* the underlying purpose of the immunity is frustrated if courts allow cases to proceed against foreign sovereigns on the basis of frivolous allegations that on their face come within an exception, but that are based on speculation rather than evidence. *Virtual Countries, Inc. v. Republic of South Africa,* 148 F.Supp.2d 256, 268 n. 14 (S.D.N.Y. 2001) (rejecting FSIA jurisdictional allegation as "speculative and conclusory"). Nevertheless, it is well established that plaintiffs facing motions to dismiss under FSIA are entitled to "limited discovery with respect to the jurisdictional issue." *First City, Texas–Houston, N.A. v. Rafidain Bank,* 150 F.3d 172, 176–177 (2d Cir. 1998) (quoting *Filus v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir.1990)). As the Second Circuit directed in *Rafidain Bank,* the Court must engage in "a delicate balancing 'between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery.' "150 F.3d at 176 (quoting *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 534 (5th Cir.1992)).

Applying these principles to this case, the Court permitted Leutwyler to engage in limited jurisdictional discovery. It now must consider whether Leutwyler has provided a sufficient basis for his factual allegations to permit litigation to proceed against these defendants.

With respect to his copyright and contract claims, Leutwyler's complaint alleges that all of the defendants "have, without Leutwyler's authorization or prior knowledge, reproduced, distributed, and publicly displayed at least two of Leutwyler's photographs ... and have included such photographs in a book entitled *The 2000 Jor-*

*dan Diary.*" (First Am. Compl. ¶ 39.) Still more generally, Leutwyler alleges that "[u]pon information and belief, Defendants have taken rights in property located in the United States in violation of international copyright laws, including but not limited to the Berne Convention for the Protection of Literary and Artistic Works." (*Id.* ¶ 68; *see also id.* ¶ 113.) Leutwyler does not supplement his scant allegations with extrinsic evidence that details the Individual Defendants' specific involvement in transmitting the photos to the IPO for publication.

However, Leutwyler endeavored through an interrogatory served on each of the Individual Defendants to determine whether their job responsibilities included "communicating with or conveying information to or from the [IPO]." (Benjamin Decl. Ex. 1 at 7; Ex. 2 at 7; Ex. 3 at 8.) Defendants declined to answer the interrogatory.[19]

In response to plaintiffs' allegations, Defendant Atalla averred in her affidavit that "[n]either The Office [of the Queen] nor any of its employees has a role in the publication of *The 2000 Jordan Diary* or any responsibilities with the IPO." (*Id.* ¶ 12.) On the other hand, she also testified as follows:

> The Office [of the Queen] frequently receives requests from other departments and from embassies for information concerning Her Majesty, including frequent requests for photographs. The Office has never received any compensation from the [IPO] or any other department or embassy in exchange for providing photographs of Her Majesty.

(Atalla Aff. ¶ 11.) Atalla carefully did not specifically deny that employees of the Office of the Queen (including the Individual Defendants) had supplied the photographs to the IPO.

The evidence of record thus suggests a reasonable basis for Leutwyler to allege that some Jordanian entity (apparently, the IPO) engaged in commercial conduct (publishing and distributing the *Jordan Diary*) that directly gave rise to Leutwyler's copyright and breach of contract claims. While the Individual Defendants generally deny involvement in these activities, their carefully-worded assertions are not inconsistent with Leutwyler's claim that they provided allegedly copyrighted photos to the IPO with knowledge that the photos would be used in a commercial manner, and they have declined to answer specific interrogatories that might clarify exactly what role they played. The mere ministerial act of transferring photos from one governmental department to another is not a "commercial activity" upon which jurisdiction can be based. However, given the involvement of Fitiany (and, as alleged by Leutwyler, perhaps the other Individual Defendants) in negotiating the terms of the very contract that Leutwyler claims was breached, if they provided the photos to the IPO with knowledge that the IPO planned to use them in violation of Leutwyler's claimed copyright, they cannot contend that they were uninvolved in the commercial activity that forms the basis of Leutwyler's complaints.[20]

**19.** The Individual Defendants responded as follows:

> See General Objections ... Defendant further objects to Interrogatory No. 11 on the grounds that the Interrogatory seeks discovery that is not relevant to or necessary for a determination of the jurisdictional issues presented to date in this case in violation of the immunity afforded by the FSIA....

(Benjamin Decl. Ex 1. at 7–8; Ex. 2 at 7–8; Ex. 3 at 8.)

**20.** Whether any actions of the Individual Defendants were sufficient to create liability for breach of contract or copyright infringement is a question on the merits. In the absence of briefing on the merits, and of a sufficient factual record to know what the Individual Defendants could be found to have done, that

Accordingly, under the principles set forth by the Supreme Court in *Nelson,* the copyright and breach of contract claims against the Individual Defendants set forth in Counts I, III and VII of the First Amended Complaint are "based upon" commercial activity within the meaning of 28 U.S.C. § 1605(a)(2), and the motion to dismiss is therefore denied as to those claims. Discovery on those claims may therefore proceed. Such discovery may well disclose individuals or entities who are more suitable defendants in connection with those claims, and leave to amend will be freely granted to add or substitute defendants as and when Leutwyler uncovers their identities.

### 2. *The Non–Commercial Tort Exception*

Leutwyler maintains that the Court has subject matter jurisdiction over his intentional infliction of emotional distress claim (Count V) under the FSIA's non-commercial tort exception. More specifically, he notes that the "exception to the exception" in § 1605(a)(5)(B) does not specifically preclude emotional distress claims from the scope of the exception's coverage. (Pls.' Mem. Opp. at 16–17.) The Individual Defendants counter that the Second Circuit's decision in *Cabiri v. Government of the Republic of Ghana,* 165 F.3d 193 (2d Cir.1999), bars an FSIA plaintiff from cloaking claims explicitly excepted from jurisdiction in the garb of tort theories not listed in subsection (B) that could be actionable under the non-commercial tort exception. (Defs.' Mem. Opp. at 17.)

In *Cabiri,* the plaintiff was the wife of Ghana's former New York-based trade representative. She alleged that in 1986, he was unexpectedly summoned back to Ghana, where government agents imprisoned and tortured him because of his possible involvement in a putative coup d'etat. 165 F.3d at 195–96. Throughout her husband's ordeal, the Ghananian government supposedly misled Cabiri about his "whereabouts or physical condition despite her repeated requests" for information. *Id.* at 199 n. 2. Cabiri subsequently filed suit against the Ghanaian government, alleging among other claims that it had intentionally inflicted emotional distress on her by lying about what had happened to her husband. The Court of Appeals noted that Cabiri had indeed pleaded a theory of tort liability that was not explicitly precluded from the scope of § 1605(a)(5). It nevertheless found that, distilled to its essence, the intentional infliction of emotional distress claim was nothing more than a creative attempt to circumvent the explicit preclusion of claims based on misrepresentation, and it therefore affirmed the district court's dismissal of the claim. *Id.* at 200.

The Supreme Court adopted similar reasoning in *Nelson.* In addition to his claim for intentionally tortious conduct, Nelson also brought a cause of action based on a supposed negligent failure to warn him of the dangers associated with taking a job in a Saudi hospital. The Court made short shrift of the argument, noting that "a plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it." 507 U.S. at 363, 113 S.Ct. 1471.

Leutwyler argues that *Cabiri* stands for nothing more than the proposition that intentional infliction of emotional distress claims based on a defendant's alleged misrepresentations are barred from the scope of the non-commercial tort exception. (Pls.' Mem. Opp. at 17.) Similarly, one

question cannot be answered at this stage of the litigation.

could distinguish *Nelson* as dealing with the commercial activity exception rather than the exception for non-commercial torts. The Court, however, declines to read these cases so narrowly. *Cabiri* and *Nelson* rest on a broader principle, directing district courts first to ascertain the claim's gravamen to determine whether the FSIA plaintiff is simply using creative nomenclature as a "semantic ploy," *Nelson,* 507 U.S. at 363, 113 S.Ct. 1471, to shroud the true essence of its theory and obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign. *See Cabiri,* 165 F.3d at 200 (holding that the intentional infliction of emotional distress claim was "subject to the proviso of § 1605(a)(5)(B)"). "To give jurisdictional significance to [such] feint[s] of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity." *Nelson,* 507 U.S. at 363, 113 S.Ct. 1471.

Here, Leutwyler alleges that the Defendants "engaged in extreme and outrageous conduct by repeatedly publishing the false statements identified herein and engaging in the other acts complained of herein." (First Am. Compl. ¶ 99.) This allegation sounds in defamation, which, as noted above, is explicitly precluded from the scope of the non-commercial tort exception. He also alleges that the individual Defendants "have ... engaged in extreme and outrageous conduct by filing and obtaining in Jordan an ex parte injunction against Leutwyler, which ex parte order, upon information and belief, is not in compliance with Jordanian law." (*Id.* ¶ 100.) That allegation effectively pleads a theory tantamount to the common law tort of abuse of process, which is also precluded under § 1605(a)(5)(B).[21] Accordingly, Leutwyler's claim for intentional infliction of emotional distress is simply an effort to recharacterize more familiar torts for which the FSIA does not remove sovereign immunity, and Count V must be dismissed for lack of subject matter jurisdiction.

### 3. *The Declaratory Judgment Count*

In Count VI of the First Amended Complaint, Leutwyler seeks a declaratory judgment that the *ex parte* injunction entered against him in the Jordanian Action on July 9, 2000 "is of no force or effect in the United States." (First Am. Compl. ¶ 105.) No exception to the FSIA allows for subject matter jurisdiction over this claim. The entering of a supposedly illegal injunction by a foreign court is demonstrably non-commercial in nature (for purposes of the commercial activity exception). Moreover, this claim appears to seek a remedy for a supposed abuse of process by the Individual Defendants (a substantive theory which, as demonstrated above, is excluded from the non-commercial tort exception). Accordingly, Count VI of Leutwyler's First Amended Complaint is dismissed for lack of subject matter jurisdiction.

## III. *Defendants' Motion to Dismiss on Grounds of Forum Non Conveniens*

Defendants have also moved to dismiss Leutwyler's complaint in its entirety on grounds that this District is a *forum non conveniens* for the action. Noting, among other things, the pendency of the Jordanian Action in the Amman Court of First Instance (the only Court, Defendants assert, in which all of Leutwyler's claims can be brought against all of the parties named

21. The term "abuse of process" is defined by a leading legal dictionary as "improper use or perversion of process after it has been issued." *Black's Law Dictionary* 11 (6th ed.1990). Leutwyler alleges that the Individual Defendants misused Jordanian legal procedures to obtain an illegal injunction against certain of his activities.

in the First Amended Complaint), and the availability of compulsory process in that court over third-party witnesses who reside in Jordan, Defendants maintain that it would vastly more efficient for the Court to dismiss the action and allow the parties to litigate their dispute in Jordan. (Defs.' Mem. Supp. at 20–23.)

A party making a motion to dismiss for *forum non conveniens* has the burden of demonstrating not only that an "alternative forum has jurisdiction to hear the case," but also that "trial in the chosen forum would 'establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience," or, alternatively, that the " 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.' " *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)).

The determination of a *forum non conveniens* motion is a matter committed to the Court's sound discretion. *Armco, Inc. v. North Atlantic Ins. Co. Ltd.,* 68 F.Supp.2d 330, 341 (S.D.N.Y.1999) (citing *R. Maganlal & Co. v. M.G. Chem. Co., Inc.,* 942 F.2d 164, 167 (2d Cir.1991)). Certain principles must guide the Court in exercising that discretion, however. For example, given that Leutwyler, a resident of the United States who maintains a home in this District, and his corporation, which is based in New York, have elected to commence an action here, the Court must accord greater deference to their decision than is usually accorded to a plaintiff's choice of forum. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 102–03 (2d Cir.2000).

Leutwyler vigorously disputes Defendants' contention that the Amman Court of First Instance would be an adequate alternative forum in which they could litigate their disputes. Among other things, he argues that the Individual Defendants, as governmental employees, would be subject to heightened protection from certain tort claims that Leutwyler has asserted against them. (Pls.' Mem. Opp. at 20.) Although the Court notes that the remedy available in the alternative forum must be found to be "so clearly inadequate or unsatisfactory" (which, based on the parties' submissions, does not appear to describe the state of Jordanian law) for it to lose its presumption of adequacy, *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. 252, it need not reach the issue, because Defendants have failed to make a requisite showing that the public and private litigation factors set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), weigh sufficiently in their favor.

For the private factors, the Court is required to take the following into account:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4)[i]ssues concerning the enforceability of a judgment; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite.

*Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292 (2d Cir.1996). As for the public factors, the Court must consider the following:

> (1) the administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citi-

zens in an unrelated forum with jury duty.

*Murray,* 81 F.3d at 293. To prevail on their motion, Defendants must demonstrate that the balance of the above-listed factors is "strongly" in their favor. *The Michael Kors Co., Inc. v. Compagnia Internazionale Abbigliamento S.p.A.,* No. 93 Civ. 8127(SHS), 1996 WL 509725, at *3 (S.D.N.Y. Sept. 9, 1996).

As for the private factors, Defendants first contend that it would be easier for the parties to access relevant proof in Jordan, because "the operative events either originated or took place [there]." (Defs.' Mem Opp. at 22.) Given the relatively undeveloped state of the evidence of record at this stage of the action, though, such a proclamation is difficult to verify. For example, although the dissemination of Leutwyler's photos, and subsequent publication by the IPO, occurred in Jordan, those actions could not give rise to a federal copyright infringement claim without subsequent sales in the United States (as are alleged by Leutwyler). Thus, it will presumably be necessary for the parties to engage in discovery in this country to determine how many copies of the *Jordan Diary* were sold here. Moreover, although it is uncertain at this time as to which jurisdiction's law would govern Leutwyler's breach of contract claim, the Court notes that Leutwyler developed the photos in New York and also mailed a letter from his office here to Toukan in which he supposedly conferred a limited usage license. (First Am. Compl. ¶ 19; Leutwyler Decl. ¶¶ 12–13 & Ex. C.) Accordingly, the first private factor does not appear to favor either side.

Defendants also maintain that they would be disadvantaged in this District as the result of not being able to subpoena unnamed third-party witnesses who are located in Jordan. (Defs.' Mem. Supp. at 22.) However, given that Leutwyler would similarly be unable to compel United States-based witnesses to appear in the Amman Court of First Instance (Pls.' Mem. Opp. at 22; Salem Aff. ¶ 15), this factor also does not favor either side. Finally, Defendants contend that it would be more convenient for the parties to litigate their dispute within the context of the Jordanian Action, because Leutwyler would be able to pursue claims against all of the originally-named Defendants in that forum. (Defs.' Mem. Supp. at 21; Haddad Aff. ¶¶ 3, 10–16, 18–20.) Defendants' expert on Jordanian law, however, does not specifically opine as to whether the Amman Court of First Instance would entertain Leutwyler's federal copyright infringement claim, and it is therefore unclear as to whether he would have the opportunity to litigate his case as completely as he seeks to here, a consideration that judges of this District have addressed when adjudicating *forum non conveniens* motions. *See, e.g., Jose Armando Bermudez & Co. v. Bermudez Int'l,* 99 Civ. 9346(AGS), 2000 WL 1225792, at *4 (S.D.N.Y. Aug. 28, 2000) (citing cases). It is evident, therefore, that the private factors do not weigh strongly in the Defendants' favor.[22]

As for the public factors, Defendants first note that this "District is one of the busiest courts in the country." (Defs.' Mem. Supp. at 22.) While that proposition may be true, Defendants do not discuss whether the action would proceed more expeditiously if it were brought in the Amman Court of First Instance. Defendants also contend that the courts of

22. Defendants do not argue that it would be more expensive for them to produce witnesses who would be willing to testify in the United States than it would be Leutwyler to do the same in Jordan, and do not address whether a judgment from this Court would unenforceable in Jordan.

the United States do not have a sufficient interest in adjudicating a dispute brought by a foreign national against employees of a foreign sovereign. (*Id.* at 23.) However, as is discussed above, Defendants ignore case law holding that actions brought by residents of the United States who happen to be foreign citizens are entitled to a strong presumption against dismissal on *forum non conveniens* grounds. Moreover, the federal courts have a clear interest in providing residents with a forum in which to litigate claims that their copyright interests have been infringed by foreign sovereigns during the course of performing commercial acts. Defendants further maintain that "Jordanian law will apply to most if not all of Plaintiffs' claims." (*Id.*) Given the Court's dismissal of Leutwyler's tort-based counts for lack of subject matter jurisdiction, however, this concern is misplaced; all but Count III (the breach of contract claim) will be governed by either federal or international law, and it is not clear at this stage of the litigation whether the law of Jordan or of New York would govern the alleged contract. Should it be determined that Jordanian contract law applies,[23] the Federal Rules of Civil Procedure provide for a clearly-defined mechanism that permits it to consider expert submissions about the foreign law. *See* Fed.R.Civ.P. 44 1 ("The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."). Accordingly, Defendants have not demonstrated that the public factors weigh strongly in their favor.[24]

Defendants have failed to satisfy their heavy burden of demonstrating that Leutwyler's decision to litigate them in his resident forum implicates *forum non conveniens* concerns. Consequently, their motion to dismiss is denied.

### IV. *Defendants' Motion to Dismiss on Grounds of Comity*

Defendants also have moved to dismiss the First Amended Complaint in its entirety on the grounds that under the doctrine of comity,[25] the Court, among other things, should defer to the pending Jordanian Action and allow it to run its course before exercising subject matter jurisdiction over the instant action. (Defs.' Mem. Supp. at 23–24.)

Because a defendant's appeal to comity asks the Court to abstain from adjudicating an action that otherwise falls within its grant of subject matter jurisdiction, a party making such an application must, in the absence of a final judgment from the foreign court, demonstrate the existence of "exceptional circumstances" that justify such an abstention. *Herbstein v. Bruetman,* 743 F.Supp. 184, 188 (S.D.N.Y.1990) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25–26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Here, the Amman Court of First Instance entered what is tantamount to a preliminary injunction

23. Defendants also contend that Court might have to apply Jordanian copyright law to decide a putative affirmative defense they might assert about their usage rights. (Defs.' Mem. Reply at 9.)

24. The final public factor, concerning "the unfairness of burdening citizens in an unrelated forum with jury duty," is inapplicable here, because Congress has not provided for jury trials in actions brought pursuant to the FSIA. *See* 28 U.S.C. § 1330; *Mukaddam,* 111 F.Supp.2d at 474 & n. 138.

25. Comity is defined by *Black's Law* as a "principle ... that courts of one state or jurisdiction will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect." *Black's Law Dictionary* 267 (6 th ed.1990).

against Leutwyler, ordering him to refrain "from selling, distributing, or publishing whatever photographs he took of His Majesty King Abdullah II and Her Majesty Queen Rania Al Abdullah and the members of their family, except with their consent and approval...." (First Am. Compl. Ex. L at 2.) However, the Jordanian court did not enter a final judgment, and explicitly noted in its interlocutory order that relief sought by the Keeper was granted "pending the outcome of the lawsuit." (Id.) Moreover, it is not clear that the order prohibiting Leutwyler from exploiting the photographs in certain ways disposes of his claim that the publication of the photos by the IPO violates his retained rights in the photographs.

■ Defendants apparently contend that this action involves substantial issues of law that, because they are deemed "important" by the Jordanian government and might potentially involve the application of Jordanian law, constitute exceptional circumstances that militate in favor of this Court's abstaining from exercising its subject matter jurisdiction. (Defs.' Mem. Supp. at 24.) Such arguments, however, can be made by foreign sovereigns in virtually any case brought pursuant to the FSIA. Considering that the defendant in an FSIA action necessarily must be a political subdivision or an agency or instrumentality of the foreign state to fall within the jurisdictional scope of that statute, any court that exercises subject matter jurisdiction over such an action will be required to adjudicate issues relating to conduct of a foreign sovereign. In enacting the FSIA—a statute that is specifically designed to increase access to the federal courts under certain circumstances for parties who were allegedly aggrieved by foreign actors—Congress surely could not have contemplated that the sovereign could effect the transfer of an action to its courts simply by deeming the underlying issues to be "important." Moreover, as

discussed above, the mere possibility that Jordanian law might govern Leutwyler's breach of contract claim is anything but exceptional (especially in this District), and is clearly contemplated by the procedures set forth in Fed.R.Civ.P. 44.1.

Consequently, because Defendants have failed to demonstrate, in the absence of a final judgment from the Amman Court of First Instance, that exceptional circumstances exist that should compel this court to defer to the Jordanian Action, their motion to dismiss is denied.

## CONCLUSION

For the foregoing reasons, Counts II, IV, V, and VI of the First Amended Complaint are dismissed for lack of subject matter jurisdiction. Defendants' motion to dismiss is denied as to Counts I, III and VII. All claims against the Office of the Queen are dismissed, because that entity does not have a juridical existence. Defendants' motions to dismiss under the doctrines of *forum non conveniens* and comity are denied.

**SO ORDERED.**